1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF HAWAII

3
  UNITED STATES OF AMERICA,    ) CRIMINAL NO. 19-00003JMS
4                              )
              Plaintiff,       ) Honolulu, Hawaii
5         vs.                  ) January 11, 2019
                               )
6                              )
  DANIEL SELLERS,              ) ARRAIGNMENT AND PLEA TO THE
7                              )  MISDEMEANOR INFORMATION
              Defendant.       )
8  _____ )

9
                    TRANSCRIPT OF PROCEEDINGS
10          BEFORE THE HONORABLE J. MICHAEL SEABRIGHT
                CHIEF UNITED STATES DISTRICT JUDGE
11
   APPEARANCES:
12
     For the Government:       MICHAEL G. WHEAT, ESQ.
13                             ERIC J. BESTE, ESQ.
                               Special Attorneys of the United States
14                             Office of the U.S. Attorney
                               880 Front Street, Room 6293
15                             San Diego, California   92101

16
     For the Defendant:
17                             RICHARD H.S. SING, ESQ.
                               The Law Office of Richard H.S. Sing
18                             841 Bishop Street, Suite 410
                               Honolulu, Hawaii   96813
19

20   Official Court            Cynthia Fazio, RMR, CRR, CRC
     Reporter:                 United States District Court
21                             300 Ala Moana Blvd., C-270
                               Honolulu, Hawaii  96850
22

23

24
   Proceedings recorded by machine shorthand, transcript produced
25 with computer-aided transcription (CAT).

 1   FRIDAY, JANUARY 11, 2019                        2:59 P.M.

 2          THE COURTROOM MANAGER:  Criminal Number 19-00003JMS,

 3   United States of America versus Daniel Sellers.  This case has

 4   been called for an arraignment and plea to a misdemeanor

 5   information.

 6          Counsel, please make your appearances for the record.

 7          MR. WHEAT:  Good afternoon, Your Honor.  Michael Wheat

 8   and Eric Beste for the United States.

 9          THE COURT:  Yes, good afternoon.

10          MR. BESTE:  Good afternoon, Your Honor.

11          MR. SING:  Good afternoon, Your Honor.  Richard Sing

12   on behalf of Mr. Sellers, who's present.

13          THE COURT:  All right.  Thank you.

14          Somebody played a trick on me, moved my chair way

15   down.  Sort of kindergarten here looking up.

16          All right.  So I do want the record to note that I

17   had -- I had my law clerk reach out to you folks this morning

18   out of some concern I have based on what I've read as to

19   whether or not essentially you're trying to put a square peg in

20   a round hole here.  And, you know, I'll hear from you folks

21   about that if you want.  You know, calling Mr. Sellers a

22   federal employee and saying he came by this information in the

23   course of employment, easy to say, I'm not sure you have the

24   facts to show that, though.

25          So, I mean, I don't know how you want to do it, if you

1  want to go through this and we'll get to that part of it or if
2  you want to have that discussion now so we can see where this
3  goes.
4         MR. WHEAT:  I think we can have that discussion now.
5         THE COURT:  Okay.
6         MR. WHEAT:  Your Honor, we've reviewed the
7  documentation that designates Mr. Sellers as a special deputy
8  or a special agent.
9         THE COURT:  With what agency?
10        MR. WHEAT:  DEA and the U.S. Marshal.
11        THE COURT:  Okay.
12        MR. WHEAT:  Those two.  And in the course of that he
13  executes paperwork which informs him of his obligations and
14  responsibilities.  And he was so sworn during the course of
15  these events.  And in particular there is a case that he worked
16  on, United States versus Lefiti, also known as Pinky, a case
17  here in the district court that Your Honor might be familiar
18  with.  He was a special DEA agent on that case and during that
19  time period.  And he was also -- we have that paperwork that
20  we've reviewed that --
21        THE COURT:  I believe you.  That's not the question.
22  I don't doubt that he was cross deputized as you say.  But wrap
23  that up for me as to how it applies here.
24        MR. WHEAT:  How it applies here is during that time
25  period he had the ability to access certain databases as a

1    special --

2         THE COURT:  And the database that he accessed here,

3    was it a federal database?

4         MR. WHEAT:  It was.  It was NCIC that was accessed.

5         THE COURT:  Did he have that ability to access it

6    because of his federal designation or could he have accessed

7    that without the federal designation?

8         MR. WHEAT:  He could have accessed it, but he did it

9    here.  And when he was involved in the investigation in this

10   case --

11        THE COURT:  No, no, but the question is at the time he

12   did this, right?  Not what happened later but at the time

13   he did it.

14        MR. WHEAT:  At the time --

15        THE COURT:  The information has to come into his

16   possession, right, based on his federal employment status, not

17   his state employment status or city employment status.  You

18   would agree with that, correct?

19        MR. WHEAT:  Yes.

20        THE COURT:  The word "federal" isn't there in the

21   statute, right?

22        MR. WHEAT:  Yes.

23        THE COURT:  But that's the modifier that's understood.

24        MR. WHEAT:  Yes.

25        THE COURT:  Okay.

1          MR. WHEAT:  At the time he was in contact with the

2     postal authorities.

3          THE COURT:  When?  Before he did it, after he did it?

4          MR. WHEAT:  Before, during and after.

5          THE COURT:  So he was in contact with the postal

6     authorities before he accessed the NCIC database?

7          MR. WHEAT:  He had accessed the database and he also

8     received information from the database.

9          THE COURT:  Okay.  So is it your understanding, you

10    know, maybe at some point I need to turn over here to Mr. Sing.

11         MR. WHEAT:  Right.

12         THE COURT:  That he saw this, when he engaged in this

13    conduct that he saw it, whether he was wearing -- you know,

14    maybe uncertain as to what hat he was wearing, but at least in

15    part he was wearing a federal hat.

16         MR. WHEAT:  Yes.

17         THE COURT:  Mr. Sing?  Because that's not reflected in

18    the papers, Mr. Wheat.

19         MR. WHEAT:  Right.  I understand, Your Honor.  And

20    after the inquiry we discuss that and we're prepared, you know,

21    I believe with the factual basis to flush that out.

22         THE COURT:  Okay.

23         MR. SING:  Your Honor, I believe that -- and we

24    support everything that Mr. Wheat has told you and I believe

25    that Mr. Sellers was really wearing two hats at that time

1    period.

2         THE COURT:  Well, I know he's wearing two hats, but

3    that's not the point.  I mean that's what I'm pushing back

4    against, right?  I understood that he had a federal hat he

5    could put on and do DEA work and help execute warrants with the

6    marshals and so forth.  I'm fully -- you know, I appreciate

7    that.  But he was employed and paid by the City and County of

8    Honolulu.

9         MR. SING:  That's correct.

10        THE COURT:  Right?  And so, the way the statute is

11   written, so we don't make it overbroad, right, he has to engage

12   in this conduct, and assuming all the other elements are met,

13   right?

14        MR. WHEAT:  Yes.

15        THE COURT:  And he has to come into this information

16   as a federal employee, based on his status as a federal

17   employee, not as an HPD officer.  And that's where there's a

18   lack of information that's been provided to me, whether it be

19   in the information or the plea agreement.

20        MR. SING:  So, I believe that at the time period

21   that's relevant when he accessed the information --

22        THE COURT:  Okay.  And to be clear, I'm talking about,

23   when you say time period, I'm talking about the very moment

24   he's clicking till I get on that database and get the

25   information.

1        MR. SING:  He had been in communication previously

2    with the federal authorities.  And like I said, it's hard to

3    distinguish, I think, the hats because --

4        THE COURT:  I may be okay if he thought he was wearing

5    two different hats and maybe we just need to go forward then

6    because I might be okay with that.

7        MR. WHEAT:  Right.

8        THE COURT:  But it seems a little inconsistent with

9    your overriding theory, Mr. Wheat, that's why I didn't really

10   expect him to say that.  Because most people who scheme to set

11   somebody up, if you're in HPD, aren't on the one hand going to

12   be calling the Postal Service and getting them involved in it,

13   on the other hand set up some innocent person --

14       MR. WHEAT:  I understand --

15       THE COURT:  -- mailbox.  I wasn't expecting to hear

16   what you're saying today.

17       MR. WHEAT:  That's correct, Your Honor, but the Court,

18   I think, is a little broad in that regard because Mr. Sellers

19   is not charged in the conspiracy scheme.

20       THE COURT:  Yeah, yeah.

21       MR. WHEAT:  Okay.  His charges are statements in the

22   existing indictments relate to statements to the FBI and

23   subsequent investigation.  He was not and is not charged in the

24   conspiracy.

25       THE COURT:  Okay.

1    MR. WHEAT:  So I think that we are consistent, we're

2    not inconsistent in that regard.

3         THE COURT:  All right.  I mean you can be

4    inconsistent, it's okay with me.  I just want to -- I didn't

5    expect you to say that today.

6         MR. WHEAT:  Right.

7         THE COURT:  Okay.  So why don't we get started.

8         I do notice, and I just want to ask a question, and

9    I'm not saying I'm going to accept the factual basis as

10   sufficient, but I think there's enough for me to go forward

11   based on what you've said.

12        MR. WHEAT:  Okay.

13        THE COURT:  Okay.  Somewhere I think in the plea

14   agreement you say the defendant will waive indictment.

15        MR. WHEAT:  Your Honor, as I indicated to your clerk,

16   we made a typographical change and that was removed.

17        THE COURT:  Okay.

18        MR. WHEAT:  Yes.

19        THE COURT:  So this is the information.

20        MR. WHEAT:  This is an information.

21        THE COURT:  We don't need to do a waiver.

22        MR. WHEAT:  Correct.

23        THE COURT:  Information to a misdemeanor, so we don't

24   need to do a waiver.

25        MR. WHEAT:  Correct.

1      THE COURT:  Okay.  All right.  So do you have a new

2   plea agreement for me, a copy of the new one?

3      MR. WHEAT:  Yeah, I tendered one to the clerk.  I can

4   give you another copy.

5      THE COURT:  Okay.  I didn't know that was a different

6   one.

7      MR. WHEAT:  You need another one, Your Honor?

8      THE COURT:  No, I have it here.

9      MR. WHEAT:  Okay.

10      THE COURT:  Okay.  I'm good.  All right.

11      It says "original" on it.  I assume I don't have the

12   original, correct?

13      MR. WHEAT:  Pardon?

14      THE COURT:  Mine says "original."  I assume it's not

15   really the original.

16      MR. WHEAT:  It is the original.

17      THE COURT:  I don't want the original.  Here, give it

18   back (handing document).  Big mistake giving me the original

19   and expect to get it back.

20      All right.  Mr. Sing, are you comfortable going

21   forward then?

22      MR. SING:  Yes, sir.

23      THE COURT:  All right.  So, Mr. Sellers, I understand

24   that you wish to enter a plea of guilty to this information

25   charging you with a violation of Title 18, United States Code,

1    Section 1905 with a plea agreement; is that right?

2           THE DEFENDANT:  Yes, Your Honor.

3           THE COURT:  All right.  So I'm going to have you

4    approach the lectern up here, if you will, with Mr. Sing so I

5    can ask you some questions.

6           All right.  So before I can accept your guilty plea

7    there are a number of questions I will be asking you to make

8    certain that your plea is both valid and voluntary.  It's

9    extremely important that you understand my questions.  So if

10   you don't understand a question, all you have to do is ask me

11   to repeat the question or rephrase the question and I will be

12   happy to do so.

13          And if you want to talk with Mr. Sing privately at any

14   point in time during this proceeding, just ask and I'll let you

15   do that.  Do you understand all that?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  All right.  Can we swear the defendant?

18          (The Defendant was sworn to answer truthfully.)

19          THE COURT:  All right.  Do you understand you are now

20   under oath and if you answer any of my questions falsely, those

21   false answers could be used against you in a separate

22   prosecution for perjury or making a false statement?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  What is your full legal name?

25          THE DEFENDANT:  Daniel Scott Sellers.

1          THE COURT:  How old are you?

2          THE DEFENDANT:  I'm 48.

3          THE COURT:  How far did you go in school?

4          THE DEFENDANT:  I graduated from college.

5          THE COURT:  Okay.  Just listening to you, I assume

6    English is your first language.

7          THE DEFENDANT:  Yes, it is, Your Honor.

8          THE COURT:  You're able to read English okay?

9          THE DEFENDANT:  Yes, Your Honor.

10         THE COURT:  So you were able to read and understand

11   bot the information and plea agreement.

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  I think I know the answer to this, but

14   I'll ask you, what has your most recent employment been?

15         THE DEFENDANT:  With the Honolulu Police Department,

16   Your Honor.

17         THE COURT:  And how long were you with the HPD?

18         THE DEFENDANT:  A little over 21 years, Your Honor.

19         THE COURT:  All right.  And how long -- what is your

20   status right now with HPD?

21         THE DEFENDANT:  I'm currently on vacation.  In

22   official leave that --

23         THE COURT:  Long vacation.

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  All right.  So how long have you been on

1   vacation?

2            THE DEFENDANT:  For just for a couple weeks right now.

3            THE COURT:  What were you doing before that?

4            THE DEFENDANT:  I was on what they called restriction

5   of police authority.  I was on limited duty.

6            THE COURT:  Okay.

7            THE DEFENDANT:  And then after two years I was given

8   an option of taking leave without pay or using my vacation, and

9   I chose to use my vacation.

10           THE COURT:  All right.  Have you had any alcohol in

11  the last 48 hours?

12           THE DEFENDANT:  No, Your Honor.

13           THE COURT:  Have you taken any illegal drugs in the

14  last 48 hours?

15           THE DEFENDANT:  No, Your Honor.

16           THE COURT:  Are you currently prescribed any

17  medication?

18           THE DEFENDANT:  No, Your Honor.

19           THE COURT:  Have you taken any prescription

20  medications in the last 48 hours?

21           THE DEFENDANT:  No, Your Honor.

22           THE COURT:  Are you clean and sober right now?

23           THE DEFENDANT:  Yes, Your Honor.

24           THE COURT:  You're thinking clearly?

25           THE DEFENDANT:  Yes, Your Honor.

1      THE COURT:  Have you ever been treated for mental
2  illness?
3      THE DEFENDANT:  No, Your Honor.
4      THE COURT:  Have you ever been treated for addiction
5  to drugs or alcohol?
6      THE DEFENDANT:  No, Your Honor.
7      THE COURT:  Tell me in your own words what you came to
8  court to do today.
9      THE DEFENDANT:  I came to court to own up to my --
10  what I've done wrong to my response -- you know, taking
11  responsibility for what I've done and to continue to move
12  forward and tell the truth and do the right thing.
13      THE COURT:  All right.  And what is it specifically
14  you're planning to do here today?
15      THE DEFENDANT:  I'm planning to plead to a charge that
16  I disclosed confidential information to Katherine Kealoha.
17      THE COURT:  Now, have you had enough time to talk to
18  Mr. Sing about the indictment, the underlying indictment in
19  this case against you, the facts of that case, the information
20  in this case, the facts regarding the information, and the
21  memorandum of plea agreement?
22      THE DEFENDANT:  Yes, I have, Your Honor.
23      THE COURT:  Are you fully satisfied with Mr. Seller's
24  representation of you in this matter?  I'm sorry, Mr. Sing's
25  representation of you in this matter?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Has anyone made any promise or assurance

3     to you of any kind in an effort to get you to plead guilty

4     other than what is in the plea agreement itself?

5          THE DEFENDANT:  No, Your Honor.

6          THE COURT:  Has anyone threatened you or anyone else

7     or forced you in any way to plead guilty?

8          THE DEFENDANT:  No, Your Honor.

9          THE COURT:  In other words, there's no undue pressure

10    on you to plead guilty?

11         THE DEFENDANT:  No, Your Honor.

12         THE COURT:  It's been your decision?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  Are you pleading guilty of your own free

15    will because you are guilty?

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  Mr. Sing, do you have any reason to doubt

18    our client's competence to enter a valid and voluntary plea?

19         MR. SING:  I do not.

20         THE COURT:  All right.  You have a copy of the

21    information there; is that right?

22         THE DEFENDANT:  Yes, Your Honor.

23         THE COURT:  All right.  I'm not going to read the

24    whole thing, but I want to go to the count on Page 3, the

25    bottom of Page 3 on to Page 4.  It says:  "Beginning on a date

1  no later than June 22nd of 2013 and continuing through June 30

2  of 2013" -- is there a statute of limitations issue that at

3  least needs to be waived here?

4          MR. WHEAT:  I was going to write that.  I think there

5  is.

6          THE COURT:  Okay.  What is the statute for a

7  misdemeanor, is it five years also or is it lesser?

8          MR. WHEAT:  (Indicating.)

9          THE COURT:  One year; is that right?

10          MR. WHEAT:  Yes.

11          THE COURT:  Okay.  All right.  We'll get to that in a

12  minute.  The information charges that from about June 22nd,

13  2013, through June 30th, 2013, you, being an employee of the

14  United States, did knowingly divulge, disclose and make known

15  in a manner not authorized by law confidential information

16  coming to you in the course of your employment and official

17  duties, which information concerned and related to the

18  processes and operations of the Criminal Intelligence Unit in

19  that you disclosed to Katherine P. Kealoha, an alleged victim

20  of a federal crime, confidential information which you learned

21  from sensitive law enforcement computer systems.  Do you

22  understand that charge?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  Do you have any questions for me or your

25  counsel regarding that charge?

1          THE DEFENDANT:  No, Your Honor.

2          THE COURT:  So, if you plead guilty and if I adjudge

3     you guilty, I want to go over the possible punishments, all

4     right?  The maximum term of incarceration is one year.  Do you

5     understand that?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  In addition, I can fine you up to

8     $100,000.  Do you understand that?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Do you also understand that you will be

11     placed on a term of supervised release of not more than one

12     year; do you understand that?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  Also there's a mandatory $25 special

15     assessment; do you --

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  All right.  Mr. Sing, have you talked to

18     him about the statute of limitations issue?

19          MR. SING:  We have.  He's prepared.

20          THE COURT:  All right.  So you understand that the

21     charge against you falls outside the statute of limitations.

22          THE DEFENDANT:  That is correct.  I understand.

23          THE COURT:  That's what we call an affirmative

24     defense.  Do you understand what that means?  It means if

25     you're charged with a crime and your lawyer and you think it

1   falls outside the statute of limitations, you can raise that

2   with the Court and ask the Court to dismiss the indictment

3   because it was brought outside the statute of limitations, or

4   an information; do you understand that?

5          THE DEFENDANT:  Yes, I do.

6          THE COURT:  Okay.  But because you've reached a

7   consensus or an agreement here with the government regarding

8   this, as I understand it, you're waiving or giving up your

9   right to make any challenge at all regarding the statute of

10   limitations; do you understand that?

11         THE DEFENDANT:  Yes, I do, Your Honor.

12         THE COURT:  In other words, you could raise it, but

13   you're giving up your right to do so.

14         THE DEFENDANT:  That is correct, Your Honor.

15         THE COURT:  And that's forever; do you understand

16   that?

17         THE DEFENDANT:  I understand that, Your Honor.

18         THE COURT:  You can't later go back to the Ninth

19   Circuit or come back to me and say, Hey, this, you know, fell

20   outside the statute of limitations.

21         THE DEFENDANT:  I understand that, Your Honor.

22         THE COURT:  Mr. Wheat, are you satisfied with that

23   coverage?

24         MR. WHEAT:  I'm satisfied with the waiver, Your Honor.

25   Thank you.

1           THE COURT:  Mr. Sing?

2           MR. SING:  Yes.

3           THE COURT:  All right.  Do you have any questions for

4   me or Mr. Sing regarding the maximum possible penalties?

5           THE DEFENDANT:  No, I do not, Your Honor.

6           THE COURT:  And you have entered into a written plea

7   agreement with the government; is that right?

8           THE DEFENDANT:  That is correct, Your Honor.

9           THE COURT:  And you read that document?

10          THE DEFENDANT:  Yes, I have, Your Honor.

11          THE COURT:  After you read it, did you discuss it with

12  Mr. Sing?

13          THE DEFENDANT:  Yes, I did, Your Honor.

14          THE COURT:  And was he able to answer any and all

15  questions you had regarding the terms of the plea agreement?

16          THE DEFENDANT:  Yes, he did, Your Honor.

17          THE COURT:  Okay.  So after you read it and discussed

18  it with him, did you understand all the terms of the plea

19  agreement?

20          THE DEFENDANT:  Yes, I do, Your Honor.

21          THE COURT:  So as you stand here right now, do you

22  understand all the terms?

23          THE DEFENDANT:  Yes, I do.

24          THE COURT:  And is that your signature on the last

25  page of the plea agreement?

1          THE DEFENDANT:  Yes, it is, Your Honor.

2          THE COURT:  Do you understand I'm not required to

3    accept the plea agreement, but that I could reject it after

4    reviewing the presentence report?

5          THE DEFENDANT:  I understand, Your Honor.

6          THE COURT:  Does this agreement, the plea agreement

7    reflect the entire understanding between you and the

8    government?

9          THE DEFENDANT:  Yes, it does, Your Honor.

10         THE COURT:  What I'm getting at, that's the question

11   that trips people up sometimes, there's no side agreements, no

12   oral agreements, nothing like that; is that accurate?

13         THE DEFENDANT:  Yeah.  I understand now, Your Honor.

14   Yes.

15         THE COURT:  Okay.  So --

16         THE DEFENDANT:  It does.  It reflects it.

17         THE COURT:  It reflects everything?

18         THE DEFENDANT:  Yes, it does.

19         THE COURT:  All right.  Do you understand that any

20   stipulations or agreements between you and the government are

21   binding on you and are binding on the government but are not

22   binding on me?

23         THE DEFENDANT:  Yes, I do, Your Honor.

24         THE COURT:  All right.  Mr. Wheat, can you go over the

25   essential terms of this agreement.

1          MR. WHEAT:  Your Honor, the essential terms is that --

2          THE COURT:  I'm sorry, Mr. Wheat, the mic.

3          MR. WHEAT:  Oh, I'm sorry.  The essential terms are

4    that Mr. Sellers will plead to this count in exchange for

5    dismissal of the charges in the superseding indictment.  And

6    also that he will waive appeal as a result of this agreement

7    and that he will cooperate with the United States.  And he has,

8    as indicated in the cooperation addendum attached to the plea

9    agreement, he has begun that cooperation and that might result

10   in a favorable sentencing recommendation.

11         THE COURT:  All right.  And he's waiving his right to

12   appeal; is that right?

13         MR. WHEAT:  That's correct.

14         THE COURT:  All right.  Is that your waiver or is that

15   a District of Hawaii waiver?  Looks like you're sort of using

16   the District of Hawaii's language.

17         MR. WHEAT:  District of Hawaii's waiver.

18         THE COURT:  Okay.  All right.  Do you have anything

19   else, Mr. Wheat?

20         MR. WHEAT:  That's done.

21         THE COURT:  Okay.  Mr. Sing, do you agree with that?

22         MR. SING:  We do, yes.

23         THE COURT:  All right.  So let me go over a few things

24   with you then, Mr. Sellers.  I want to make sure you understand

25   that normally after a conviction or sentence here in federal

1    court there are two ways or two methods by which you could

2    challenge a sentence or conviction that you thought was either

3    unlawful or unconstitutional.

4           The first is to appeal to the Ninth Circuit Court of

5    Appeals.  That's a separate court that sits to determine if

6    errors are made here at the trial court level.

7           A second way is come back to me.  In the plea

8    agreement we refer to this as a collateral attack.  That's sort

9    of a fancy description to mean you file a motion with me asking

10   for some relief.

11          Through this plea agreement you're waiving or giving

12   up most of your rights to appeal or to bring any sort of

13   collateral attack.  Do you understand that?

14          THE DEFENDANT:  I understand that, Your Honor.

15          THE COURT:  The government keeps or retains its right

16   to appeal any sentence I impose.  Do you understand that?

17          THE DEFENDANT:  I understand that, Your Honor.

18          THE COURT:  Now, there are exceptions.  Let me go over

19   those, all right?

20          I will determine what the guideline range is in your

21   case.  If I sentence you above what that guideline range calls

22   for, then you can appeal or collaterally challenge that portion

23   of the guidelines in excess of the sentence, in excess of what

24   the guidelines called for; do you understand that?

25          THE DEFENDANT:  I understand that, Your Honor.

1          THE COURT:  Secondly, you can bring a claim of

2    ineffective assistance of counsel, but you're usually sort of

3    limited on how you can do that, the process.  You would have to

4    file that, you almost always would have to file that first in

5    the district court because a record has to be established.  So

6    you could file that here.  I would rule on that motion.  If I

7    denied it, then you can appeal that to the Ninth Circuit.  Do

8    you understand that?

9          THE DEFENDANT:  I understand that, Your Honor.

10         THE COURT:  Otherwise you're giving up or waiving any

11   right to appeal or bring any sort of collateral attack; do you

12   understand that?

13         THE DEFENDANT:  I understand that, Your Honor.

14         THE COURT:  Do you have any questions about that?

15         THE DEFENDANT:  No, Your Honor.

16         THE COURT:  Do you have any questions about the terms

17   of the plea agreement?

18         THE DEFENDANT:  No, Your Honor.

19         THE COURT:  All right.  Let me go over now with you

20   some important rights that you give up by entering a plea of

21   guilty.

22         First, under the Constitution and laws of the United

23   States you have an absolute right to persist in a plea of not

24   guilty and proceed to trial by jury on the charges against you

25   in the indictment, as well as this information; do you

1   understand that?

2           THE DEFENDANT:  I understand that, Your Honor.

3           THE COURT:  All right.  At a trial you would be

4   presumed innocent and the government would have the burden to

5   present evidence to prove your guilt beyond a reasonable doubt

6   and at no time would you have to prove that you are not guilty;

7   do you understand that?

8           THE DEFENDANT:  I understand that, Your Honor.

9           THE COURT:  To be found guilty at a trial a jury of 12

10  impartial citizens would have to be in unanimous agreement as

11  to your guilt beyond a reasonable doubt.  That applies to each

12  count and each essential element of that count.  Do you

13  understand that?

14          THE DEFENDANT:  I understand that, Your Honor.

15          THE COURT:  Mr. Sing, are you retained or court

16  appointed?

17          MR. SING:  I am retained, Your Honor.

18          THE COURT:  Okay.  If you wanted to go to trial but

19  could not afford counsel to do so, one would be appointed for

20  you free of charge throughout the trial process; do you

21  understand that?

22          THE DEFENDANT:  I understand that, Your Honor.

23          THE COURT:  At a trial you would have the right to see

24  and hear all the government witnesses and have those witnesses

25  questioned or what we call cross examined by your attorney.  Do

1    you understand that?

2              THE DEFENDANT:  I understand that, Your Honor.

3              THE COURT:  At a trial you could object to evidence

4    offered by the government.  And although you're never required

5    to do so, you could offer evidence on your own behalf and you

6    could force or compel witnesses to appear in court to testify

7    using the Court's subpoena power.  Do you understand that?

8              THE DEFENDANT:  I understand that, Your Honor.

9              THE COURT:  Now, in any criminal trial, typically at

10   the very end of the trial, certainly in the defense case, a

11   defendant has a decision to make, and that is whether to

12   testify or not to testify.  And if you went to trial you would

13   have an absolute right to testify and take the stand, testify

14   as any other witness would, or you could not testify.  You

15   could elect not to testify.  And the decision whether to

16   testify or not testify would be your decision, not Mr. Sing's.

17   He would give you his best advice, you know, throughout the

18   case as to whether he thought it was a good idea or not and

19   he'd talk about it with you, but just like your decision here

20   today to plead guilty is your decision, not his, the decision

21   whether to testify or not would be your decision.  Do you

22   understand that?

23             THE DEFENDANT:  I understand that, Your Honor.

24             THE COURT:  If you did testify, I would tell the jury

25   to judge your testimony using the same rules or guidelines they

1   use to judge all witnesses' testimony.  Do you understand that?

2          THE DEFENDANT:  I understand that, Your Honor.

3          THE COURT:  And if you chose not to testify, I would

4   tell the jury they could not hold that fact against you.  I

5   would instruct the jury as a matter of law that they could draw

6   no inference or suggestion of guilt because you did not

7   testify.  Do you understand that?

8          THE DEFENDANT:  I understand that, Your Honor.

9          THE COURT:  All right.  By pleading guilty, if I

10  accept your plea, there will be no trial and you will have

11  waived or given up your right to a trial and all these other

12  rights we just discussed.  Do you understand all that?

13         THE DEFENDANT:  I understand that, Your Honor.

14         THE COURT:  Do you also understand you're going to

15  have to give up your right to remain silent because if you

16  plead guilty I'm going to ask you what you did that makes you

17  guilty.  Do you understand that?

18         THE DEFENDANT:  I understand that, Your Honor.

19         THE COURT:  Do you have any questions regarding these

20  rights for me or Mr. Sing?

21         THE DEFENDANT:  No, Your Honor.

22         THE COURT:  Knowing these rights do you still wish to

23  go forward with your plea?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  All right.  You're not currently charged

1   with any other offense or serving any type of sentence,

2   correct?

3          THE DEFENDANT:  That is correct, Your Honor.

4          THE COURT:  All right.  So this is a full misdemeanor,

5   so the guidelines do apply; do I have that right, Mr. Wheat?

6          MR. WHEAT:  That is correct, Your Honor.

7          THE COURT:  Okay.  So we do have detailed sentencing

8   guidelines that I must consider when I impose sentence.  In

9   addition to the sentencing guidelines there are several other

10  sentencing factors set forth in the law at 18, United States

11  Code, Section 3553(a) that I must take into consideration.

12  Have you and Mr. Sing discussed the sentencing guidelines and

13  these other sentencing factors and how they may apply to your

14  case?

15         THE DEFENDANT:  Yes, we did, Your Honor.

16         THE COURT:  And do you understand you won't know what

17  the guidelines are for sure until the day of sentencing,

18  because a draft presentence report will be prepared, you could

19  object to it, the government could object to it, I could sua

20  sponte disagree with it.  So I will pronounce what the

21  guidelines are on the day of sentencing; do you understand

22  that?

23         THE DEFENDANT:  I understand that, Your Honor.

24         THE COURT:  And after I determine those guidelines, I

25  will consider them and the other sentencing factors, and

1    exercising my discretion I may impose a sentence below the
2    guideline range, within the guideline range or above the
3    guideline range.  Do you understand that?
4            THE DEFENDANT:  I understand that, Your Honor.
5            THE COURT:  And if the sentence is worse or more
6    severe than you had hoped or expected to receive, or worse or
7    more severe than called for by the guidelines, you will not be
8    able to withdraw from your plea of guilty; do you understand
9    that?
10           THE DEFENDANT:  I understand that.
11           THE COURT:  Put differently, there's no buyer's
12   remorse, do you understand?
13           THE DEFENDANT:  I understand that, Your Honor.
14           THE COURT:  All right.  Now, you may have had
15   discussions with Mr. Sing, and maybe there were discussions
16   between Mr. Sing and the government, I don't know about the
17   type of sentence you may receive as a result of all of this.
18   But what I want to make sure you understand is any discussions
19   with Mr. Sing or any third parties, including the government,
20   are not binding on me, but I can sentence you up to the maximum
21   permitted by law.  Do you understand that?
22           THE DEFENDANT:  I understand that, Your Honor.
23           THE COURT:  Has anyone made any promise to you of any
24   sort as to what your sentence will be?
25           THE DEFENDANT:  No, Your Honor.

1          THE COURT:  Do you understand a term of supervised

2     release will be imposed and if you violate a condition of

3     supervised release you could be sent back to prison?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Do you understand there is no parole in

6     the federal system, so you will not be released early on

7     parole?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Mr. Wheat, I assume neither forfeiture nor

10    restitution is applicable here?

11         MR. WHEAT:  That's correct, Your Honor.

12         THE COURT:  All right.  So, let's start with the

13    elements of the offense.  And I'm not sure I agree with the

14    elements as set forth in the plea agreement for two reasons:

15    One, I think it's missing some things, and two, I think the

16    reference to 1833(b)(4) is incorrect because that statute

17    itself says it only applies to this subsection.  I think -- I

18    have no problem with him being designated an agent falling

19    within an employer -- employee or officer of the United States,

20    I don't have a problem with that, but I'm not sure you're using

21    the right statute to incorporate here because 1833(b)(4) by its

22    own language is limited to that subsection.  If you're saying

23    that as guidance we can use, Mr. Wheat, I don't really have a

24    huge problem with that.

25         MR. WHEAT:  Guidance, Your Honor.

1          THE COURT:  All right.  So let me tell you what I

2    think the elements are as I see it.  And then we can go from

3    there.

4          First, that the defendant is an officer or employee of

5    the United States.  Second, the defendant knowingly publishes,

6    divulged, discloses or makes known in any manner or to any

7    extent not authorized by law.  Third, any confidential

8    information coming to him in the course of his employment or

9    official duties.  And fifth, which he knows to be confidential.

10         So that's how I see the elements.  And some of that is

11   missing from the elements as set forth in the plea agreement.

12   In particular, the coming to him in the course of his

13   employment, the area that I'm most concerned about based on the

14   facts as set forth in the plea agreement and the information.

15         So do either counsel have any comment on my

16   articulated elements?

17         MR. WHEAT:  I think that that's correct.  I mean I

18   think that he can meet those elements.

19         THE COURT:  Well, that's not my question whether you

20   can meet the elements.  The question is whether you agree those

21   are the elements.

22         MR. WHEAT:  I agree.

23         MR. SING:  I agree as well.

24         THE COURT:  All right.  Okay.  All right.  With that

25   then, what I'm going to do, Mr. Wheat, is ask you to provide an

1    overview of the evidence that you believe you could present if

2    this case went to trial.

3         Mr. Sellers, you've got to listen carefully because

4    when Mr. Wheat's done I'm going to ask you if you agree or

5    disagree in whole or in part with what he said and we'll

6    probably have a further conversation.  Okay?

7         THE DEFENDANT:  Yes, Your Honor.

8         MR. WHEAT:  Your Honor, if this case were to go to

9    trial the United States would be able to prove beyond a

10   reasonable doubt that during the week of June 22nd, 2013,

11   through June 30, 2013, Mr. Sellers was assigned to the Criminal

12   Intelligence Unit, a federally funded portion of the Honolulu

13   Police Department.  And there he was assigned to conduct

14   surveillance in a criminal case under the direction of the

15   Criminal Intelligence Unit involving the alleged theft of a

16   mailbox at 1018 Kealaolu Street here in Honolulu.

17        And during the course of that surveillance Mr. Sellers

18   learned from his inquiries into the NCIC database about an

19   alleged vehicle that may have been used or allegedly was used

20   in the course of this theft.  And towards the end of the week

21   on the 29th or 30th of June he learned from the

22   criminal intelligence -- excuse me, from the Criminal

23   Investigative Division that the person who was driving that car

24   was in fact not the person who -- that car was not used.  He

25   then conveyed that information --

1          THE COURT:  I'm sorry, CID learned -- he learned from

2     CID what?  I lost --

3          MR. WHEAT:  He learned from CID that the car that was

4     allegedly used was not in fact used in the theft.  He then

5     communicated that investigative fact that he learned from

6     accessing the computer on who that person was, who owned that

7     car to Katherine P. Kealoha.

8          And he had no authorization.  He knew that that

9     information was confidential.  He gained that information

10    during the course of his employment.

11         During this same time period, Mr. Sellers was in

12    communication with the United States postal inspector and

13    working with him regarding the theft of this mailbox, alleged

14    theft.

15         THE COURT:  All right.  And he was cross deputized.

16         MR. WHEAT:  And he was cross deputized during that

17    time as a federal agent or officer.

18         THE COURT:  All right.  Mr. Sing, do you have anything

19    to add to that?

20         MR. SING:  No, Your Honor, we agree with that.

21         THE COURT:  All right.  So first, Mr. Sellers, did you

22    understand everything that Mr. Wheat said?

23         THE DEFENDANT:  Yes, I do, Your Honor.

24         THE COURT:  Is everything he said true and correct?

25         THE DEFENDANT:  It's true and correct, Your Honor.

1          THE COURT:  All right.  So tell me in your own words
2     what did you do that makes you guilty, you tell me.
3          MR. SING:  Your Honor, he has a prepared statement if
4     the Court would --
5          THE COURT:  I don't want you to use a prepared
6     statement, I want you to look me in the eye and tell me what
7     you did.
8          THE DEFENDANT:  Okay.  As a Honolulu police detective
9     I was cross-sworn as a federal agent and -- and a deputy.  On
10    June of 2013 I obtained confidential information through --
11    through the law enforcement computer and accessed --
12         THE COURT:  Okay.  So the computer was what, this is
13    NCIC database?
14         THE DEFENDANT:  Yes, Your Honor.
15         THE COURT:  Did you have access because of your
16    federal status?
17         THE DEFENDANT:  Well, we all have access, Your Honor,
18    regardless, whether it be in the state or what, but we do have
19    federal guidelines that we -- you know, that I read and, you
20    know, comes up --
21         THE COURT:  That's irrelevant to me though.
22         THE DEFENDANT:  Okay.
23         THE COURT:  I see you've been programmed a little bit
24    to say some things.  I don't want you to say --
25         THE DEFENDANT:  Okay.

1       THE COURT:  -- what you're thinking I want to hear or

2   what you should say.  I want you to answer my question.

3       THE DEFENDANT:  Okay.

4       THE COURT:  Okay?  Otherwise you're going to get

5   upside down with me here.  Okay?  So I want you to listen to

6   the questions and --

7       THE DEFENDANT:  Yes, sir.

8       THE COURT:  -- and help me out here.  Okay?

9       The NCIC database, it didn't matter you were

10  cross-designated, you could have gotten on to that regardless,

11  correct?

12      THE DEFENDANT:  That's correct, Your Honor.

13      THE COURT:  All right.  Okay.  So it wasn't as if you

14  were using federal credentials or anything of that sort to

15  access that database?

16      THE DEFENDANT:  That is correct, Your Honor.

17      THE COURT:  All right.  At the time you accessed that

18  database, and the exact date as I understand it was June 22nd,

19  does that sound about right?

20      THE DEFENDANT:  I -- I believe it was the 23rd that I

21  accessed it.

22      THE COURT:  Okay.  All right.

23      THE DEFENDANT:  The 23rd and the information provided

24  was spread out throughout that week.

25      THE COURT:  Okay.  23rd.  All right.  So on that date

1   you had accessed the database, correct?

2          THE DEFENDANT:  That's correct, Your Honor.

3          THE COURT:  Okay.  You heard our discussion a little

4   bit earlier about sort of the federal hat versus the HPD hat,

5   right?

6          THE DEFENDANT:  That's correct.

7          THE COURT:  You understand what I meant by that?

8          THE DEFENDANT:  I understand, yes.

9          THE COURT:  Right?  Sort of a descriptor of, you know,

10  what kind of job you're doing at the time you accessed that

11  database.

12         THE DEFENDANT:  That is correct, Your Honor.

13         THE COURT:  So that's what I want to get at now, I

14  want to have that discussion.  The time, you know, you were

15  entering the query in that database, what role were you playing

16  at that point in time?  In your mind, who were you, were you --

17         THE DEFENDANT:  I was an investigator for the mailbox

18  case.

19         THE COURT:  Okay.

20         THE DEFENDANT:  As a Honolulu police officer.

21         THE COURT:  Okay.  Were you wearing your federal hat

22  at all at that point in time?

23         THE DEFENDANT:  At that point, no, Your Honor, but

24  shortly after when I contacted Brian Shaughnessy see of the

25  U.S. Postal I felt that it could go in that direction.  So --

1          THE COURT:  Okay.  So let me stop you just for a

2    minute.  So when you accessed the database, you were not

3    wearing the federal hat; is that a fair statement?

4          THE DEFENDANT:  That's a fair statement.

5          THE COURT:  Okay.  And then -- and that was June 23rd,

6    right?

7          THE DEFENDANT:  That is correct.

8          THE COURT:  Okay.  And then you -- I'm sorry, you then

9    had contact with someone at the U.S. Postal Service?

10          THE DEFENDANT:  Yes.  I believe I had contact with him

11    prior and a contact with him -- prior to I believe I had -- I

12    had contact with the U.S. Postal.

13          THE COURT:  Okay.  I thought you just told me it was

14    after?

15          THE DEFENDANT:  Not -- it was -- it was before and

16    after.  I talked to him a couple times.

17          THE COURT:  Okay.  Let me be clear because now you're

18    saying something I understand to be a little bit different, but

19    maybe I misheard you.

20          THE DEFENDANT:  Okay.

21          THE COURT:  Okay.  When you, again, were entering that

22    query into the database.

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  Had you at that point in time contacted

25    anyone at the U.S. Postal Service?

1        THE DEFENDANT:  I'm not too sure, I don't believe so.

2   I may have, I may not have.  But I know during the process when

3   I accessed the computer, I called him up because it was, you

4   know, I -- I looked at it as possibly being a federal crime and

5   throughout my career I have always tried to, you know, go the

6   federal route because of the -- I guess because it -- of the

7   codes, of the -- you know, the -- it's just harsher on -- on

8   criminals anyway.  I've dealt with drugs on this level for a

9   very long time.  So we always tend to try to have it adopted by

10  federal -- federal standards and worked with the DEA and FBI

11  over the years.  That's the reason why I called Brian

12  Shaughnessy see, Your Honor.

13       THE COURT:  Okay.  Again I'm asking you when did you

14  talk to Brian Shaughnessy see?

15       THE DEFENDANT:  I remember talking to him after.

16       THE COURT:  After.  Okay.

17       THE DEFENDANT:  Yes.

18       THE COURT:  So at the time you queried that database,

19  you weren't doing it, as I understand what you're telling me,

20  in your capacity as a task force officer, you were doing it as

21  an HPD officer.

22       THE DEFENDANT:  That is correct, Your Honor.

23       THE COURT:  All right.  Turning to counsel, as I

24  understand it, that is the information that he came into --

25  that he obtained that later he disclosed to Katherine Kealoha.

1          MR. WHEAT:  Your Honor, I believe that it's part of

2     the information that he obtained.

3          THE COURT:  What other information do you have you

4     could present that he obtained?

5          MR. WHEAT:  He obtained during that query the name and

6     identified --

7          THE COURT:  No, no, I'm saying there was just one

8     query though that you claim is the access or are there other

9     queries?

10          MR. WHEAT:  Well, let me see if I can flush out for

11     the Court.

12          He obtained names and information regarding vehicles

13     and relatives of somebody that was identified as a suspect.  He

14     then communicated that information to the postal authorities.

15          Then, after subsequent investigation later in the

16     week, he used that information along with other information

17     that he obtained from CID officers with the police department

18     and communicated that combination of information to Katherine

19     Kealoha.

20          THE COURT:  All right.  But you see --

21          MR. WHEAT:  And that disclosure --

22          THE COURT:  You see, the confidential information in

23     my view, okay, looking at the statute, the confidential

24     information that the person later discloses has to come into

25     their possession in the course of their federal employment.

1   And he just told me it didn't.  Is there other confidential

2   information other than the NCIC query?

3          MR. WHEAT:  May I talk to counsel for a moment?

4          THE COURT:  You may.

5                  (Pause in the proceedings.)

6          THE COURT:  If you folks want to take a ten-minute

7   recess, I'm happy to leave the bench for ten minutes, if you

8   need to talk to your client and to Mr. Wheat.

9          MR. SING:  Maybe.  Thank you, sir.

10         THE COURT:  All right.  Take a short recess.

11     (A recess was taken from 3:37 p.m. to 3:44 p.m.)

12         THE COURT:  You may be seated.  Thank you all.

13         Mr. Sellers, I remind you you're still under oath.

14         Okay.  So, I think I left to allow a little bit of

15  discussion to go on here.  I think it was -- where we left off

16  was at the time Mr. Sellers accessed the NCIC database he was

17  not doing so in his role as a cross-designated agent and I was

18  sort of asking if there were other things and that's when we

19  took a break.

20         MR. WHEAT:  Yeah.  Your Honor, it's not just his

21  access, but the statute says, "information coming to him in the

22  course of his employment."

23         THE COURT:  But I haven't been told about any

24  information other than NCIC.

25         MR. WHEAT:  Right.  Right.  So I think that's what

1    he's prepared to address is information coming to him.

2           THE COURT:  All right.  Okay.  So what information

3    came to you in the course of your federal employment during

4    this time period, this week period or so?

5           THE DEFENDANT:  After running that name, as I

6    explained before, in the capacity of a police officer, I looked

7    towards the federal government in which I work with Brian

8    Shaughnessy see in the postal -- in the postal inspector, you

9    know, over the past couple years.  The information that was

10   passed on to him was in that capacity of being a federal agent

11   along with other information involving the -- I guess the

12   printouts of Gerard Puana in a packet that we were passing

13   around during that week, information regarding his address, his

14   vehicles that was registered to him.  And this information was

15   passed on, on that Friday, that 29th, along with the -- letting

16   her know that the neighbor -- the neighbor's car was not the

17   car that was in the video.  I also notified her that --

18          THE COURT:  I'm going to stop you because I'm as

19   confused as ever right now.  Okay.  I'm really confused as ever

20   as to what information came into your possession.  I'm not

21   asking what you gave someone else right now, right?

22          THE DEFENDANT:  The information that came into my

23   possession --

24          THE COURT:  Because all I've heard about is the NCIC

25   so far.  Right?  Was there other information that came into

1   your possession that was confidential after the NCIC search?

2          THE DEFENDANT:  After the NCIC search, other

3   information came in.

4          THE COURT:  What information?

5          THE DEFENDANT:  It was information of driver's license

6   photos, vehicle registrations, including Social Security

7   numbers and addresses, and also the registered owner -- well,

8   the -- the vehicles that was registered under Gerard Puana also

9   came into my possession during that week.

10         THE COURT:  You say came into your possession, how did

11  it come into your possession?

12         THE DEFENDANT:  Well, I viewed it.  That's what I was

13  explaining before.  It was -- during this operation we made a

14  packet.

15         THE COURT:  "We" doesn't cut it.

16         THE DEFENDANT:  The Criminal Intelligence Unit, Your

17  Honor.

18         THE COURT:  No, no, no, no, that doesn't cut it.  The

19  Criminal Intelligence Unit isn't on trial here, right?  Or the

20  information doesn't charge the CIU, it charges you.

21         THE DEFENDANT:  Yes.

22         THE COURT:  Right?  So I need to know what you, what

23  information you obtained.

24         THE DEFENDANT:  Well, I was in -- I had in -- in my

25  possession --

          1          THE COURT:  No, no, that -- I didn't ask you what was
          2     in your possession.
          3          THE DEFENDANT:  I don't understand quite the question,
          4     Your Honor.
          5          THE COURT:  What the statute requires is that the
          6     information comes to you.  Your obtaining that information, is
          7     what it's requiring.  And then you disclose it.  It doesn't
          8     have to be a computer search, it could be a conversation, I
          9     assume it could be a lot of different things.
         10          THE DEFENDANT:  It was informed --
         11          THE COURT:  But you're talking about this sort of
         12     globally what CIU was up to, you see.
         13          THE DEFENDANT:  It was -- it was in the form of a
         14     printout.  Multiple -- multiple --
         15          THE COURT:  How did you get the printout?
         16          THE DEFENDANT:  I don't know exactly how it was, you
         17     know, how it was printed out.  I could have print it out and my
         18     I.D. number, you know, may not have been registered on the
         19     certain printouts that was discovered years later.  It -- it
         20     could have been done through others.  I've seen printouts that
         21     were done by, you know, by Derek Hahn, by Niall Silva that was
         22     inside of a -- inside of a packet that was placed in a burn box
         23     and was discovered years later involving this incident.  I
         24     reviewed it during discovery.  I recall looking at those
         25     documents.  I recall having conversations -- or a conversation

1    at the time with Kathy Kealoha about the uncle not having in

2    his -- I mean in his possession being a registered owner of a

3    white car.  And that the white car that I saw in the vehicle --

4    that I saw in the video was not the car of the neighbor's.  And

5    that's the -- the physical evidence that I saw and how it was

6    obtained.

7         THE COURT:  Okay.  What information did you obtain

8    from the NCI search that's different than what you obtained

9    through these printouts that you're not sure if you printed out

10   or someone else printed out and gave to you?

11        THE DEFENDANT:  I don't quite -- what is different,

12   Your Honor?

13        THE COURT:  Yeah, between what you did -- when you

14   did -- when you did the NCIC search, what information did you

15   obtain?

16        THE DEFENDANT:  I obtained the --

17        THE COURT:  What were you looking for?

18        THE DEFENDANT:  I was looking for -- I was looking for

19   the -- there was a vehicle that was the neighbor's vehicle.

20        THE COURT:  Whose neighbor?

21        THE DEFENDANT:  The next -- I'm sorry, Your Honor.

22   The neighbor of Gerard Puana.

23        THE COURT:  Okay.

24        THE DEFENDANT:  I saw a white car on the Sunday the

25   23rd.

1          THE COURT:  So you did surveillance and you saw a
2    white car?
3          THE DEFENDANT:  I did surveillance, I saw the white
4    car.
5          THE COURT:  And it was a Lexus or something?
6          THE DEFENDANT:  It was an Acura.
7          THE COURT:  Acura.  Okay.  So you see a white Acura.
8          THE DEFENDANT:  I believed at the time that the
9    particular Acura matched or somewhat matched the video that I
10   saw earlier that evening.
11         THE COURT:  Okay.  So the video, just to be clear, was
12   the video obtained from the Kealoha residence or at least
13   that's what you believed?
14         THE DEFENDANT:  Yes, that's what I believed, sir.
15         THE COURT:  Okay.  So you observed that video and
16   observed what appeared to be a car at least similar to that you
17   thought could be a match to the Puana neighbor's vehicle?
18         THE DEFENDANT:  That is correct, Your Honor.
19         THE COURT:  Okay.  So then go forward then with the
20   NCIC search, what were you doing?
21         THE DEFENDANT:  So on that night on surveillance I
22   observed the vehicle.  I came back into the office.  I ran the
23   check of the vehicle -- check of the vehicle and also I ran the
24   Hawaii state driver's license check of the name of the
25   registered owner.

1          THE COURT:  Okay.  So you put into NCIC the license
2     plate number?

3          THE DEFENDANT:  That is correct.

4          THE COURT:  Okay.  And from that you get a name of the
5     registered owner?

6          THE DEFENDANT:  That is correct, Your Honor.

7          THE COURT:  And then -- and let's not use the owner's
8     name here, we don't need to do that.

9          THE DEFENDANT:  Yes.

10          THE COURT:  And then you ran the owner's name?

11          THE DEFENDANT:  That is correct.

12          THE COURT:  In what -- in what, NCIC also or is that a
13     different --

14          THE DEFENDANT:  Through -- it was a state -- our state
15     department driver's license.  I'm not too sure of the website
16     that is --

17          THE COURT:  Okay.  All right.  So, then you have
18     information about the -- who the white Acura is registered to
19     and some information about that person; is that accurate?

20          THE DEFENDANT:  That is correct.

21          THE COURT:  Okay.  And I think we've established at
22     that point in time you didn't have -- or at least you don't
23     believe you had federal contacts, as you put it, you weren't
24     wearing a federal hat at that point.

25          THE DEFENDANT:  That is correct, Your Honor.

1          THE COURT:  Sometime after that you talked to Brian
2    Shaughnessy see; is that right?
3          THE DEFENDANT:  Shortly after, the next day I believe.
4          THE COURT:  The next day.
5          THE DEFENDANT:  Yes.
6          THE COURT:  Okay.  Then after that do you come into
7    possession of more confidential information?
8          THE DEFENDANT:  Yes, Your Honor.
9          THE COURT:  And tell me what confidential information
10   you come into at that point in time.
11         THE DEFENDANT:  It was the -- it's part of also
12   discovery.  The address, the registered -- I should say license
13   plates of registered owner Gerard Puana.  I believe it was a
14   printout of Gerard Puana.  I believe it was Gerard Puana's --
15   that the vehicles as well as the CJIS, his criminal background
16   I believe.
17         THE COURT:  So it was sort of running a background on
18   Puana.
19         THE DEFENDANT:  That is correct.
20         THE COURT:  The uncle, correct?
21         THE DEFENDANT:  That is correct, for that week because
22   we're beginning surveillance on that particular -- on that
23   Monday the 24th.
24         THE COURT:  Okay.  And is that -- that printout that
25   you got, so put aside the NCIC, right?  And let's talk about

1  after you had a conversation with Shaughnessy, right, Inspector

2  Shaughnessy.

3          THE DEFENDANT:  Yes.

4          THE COURT:  That information you came into possession

5  of, right, the printouts you called it?

6          THE DEFENDANT:  That is correct.

7          THE COURT:  And I understand you don't know if you ran

8  it or someone else ran it.

9          THE DEFENDANT:  Yes, Your Honor.

10         THE COURT:  Okay.  But it came into your possession?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  Okay.  Was that known to you to be

13  confidential information?

14         THE DEFENDANT:  Yes, I did, Your Honor.

15         THE COURT:  And tell me why that is.

16         THE DEFENDANT:  Because I guess in the state or, you

17  know, every time that we sign on we, you know, we have

18  confidential agreements and laws that prohibited any disclosure

19  to anyone other -- you know, not authorized or in their

20  personal capacity.

21         THE COURT:  Is it fair to say it was the official

22  policy of HPD and as far as you knew federal agencies that you

23  not disclose that information?

24         THE DEFENDANT:  That is correct, Your Honor.

25         THE COURT:  Counsel, do you know offhand if there's

1   regulation or statute that further restricts that?

2         MR. WHEAT:  There is, Your Honor.  There is a banner

3   that appears on NCIC when they sign in and you agree to it when

4   you begin an account at NCIC that states that it's confidential

5   to be used only -- it's property of the United States to be

6   only used for the United States' purposes.

7         THE COURT:  Okay.  And let me ask you this question,

8   Mr. Wheat, because you might be able to help here.  The

9   printouts that he says he later saw.

10         MR. WHEAT:  Yes.

11         THE COURT:  I think you understand where I'm going

12   with this.

13         MR. WHEAT:  Yes, I do.

14         THE COURT:  The printouts that he said he saw later,

15   were those printouts as a result of an NCIC query?

16         MR. WHEAT:  They were.

17         THE COURT:  Okay.

18         MR. WHEAT:  And other databases, but there were NCIC

19   printouts contained in this packet of information that was

20   being passed around by CIU.

21         THE COURT:  Okay.  All right.  So let's talk about the

22   post, after the Brian Shaughnessy contact, okay?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  All right.  So you contacted -- what do

25   you talk to him about, just so -- I think I understand, but

1  let's put it on the record.

2         THE DEFENDANT:  I wanted to see if this theft was a

3  federal crime.  You know, if the theft of a mailbox or there

4  had to have been mail.  You know, I was inquiring about other

5  outlets of, you know, furthering the prosecution anyway.

6         THE COURT:  So based on what you said before, that's

7  sort of what I understood.  You were sort of like looking into

8  the possibility of a joint investigation of some sort, bringing

9  the Postal Service into it and working with them, and you felt

10  you could do that in part because you were a cross-designated

11  federal agent.

12         THE DEFENDANT:  That is correct, Your Honor.

13         THE COURT:  Okay.  All right.  And as I understand,

14  that was part of the way you often did business.

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  All right.  So again, the packet of

17  information that Mr. Wheat discussed, the post Shaughnessy, I

18  assume it was a telephone call.

19         THE DEFENDANT:  Yes, it was a couple telephone calls,

20  yes, at least.

21         THE COURT:  The post Shaughnessy, after Shaughnessy

22  telephone calls you get a packet of information.

23         THE DEFENDANT:  That is correct.

24         THE COURT:  And that includes some NCIC printouts.

25         THE DEFENDANT:  That is correct, Your Honor.

1          THE COURT:  Okay.  And you understood that that packet

2    of information you got, including the NCIC printouts, could not

3    be released under either the policy of HPD, the federal

4    government or actually under regulation or law.

5          THE DEFENDANT:  I understood that, sir.

6          THE COURT:  Okay.  And what of that information, that

7    post-Shaughnessy contact information did you disclose to

8    Katherine Kealoha?

9          THE DEFENDANT:  I told her that during the 29th when I

10   got the information back, I got contact back from the

11   detectives who interviewed -- who just finished

12   interviewing the neighbor of the white car that we were taking

13   a look at on my initial query.  I told her that the car that is

14   registered to Gerard Puana, which was the neighbor, was not the

15   vehicle that was -- that was seen in the video and that there

16   was also information that he does not drive a white car based

17   on --

18          THE COURT:  Who's "he"?

19          THE DEFENDANT:  Gerard Puana, Your Honor.

20          THE COURT:  Okay.

21          THE DEFENDANT:  That her uncle Gerard Puana does not

22   own or -- or is registered because we have done these checks

23   through this system and I disclosed that information to her.

24          THE COURT:  All right.  So after you spoke to Brian

25   Shaughnessy, is it fair to say you were at least considering a

1    potential federal prosecution?

2         THE DEFENDANT:  I think that would be more than fair

3    to say, yes.

4         THE COURT:  All right.  And so although you were an

5    HPD employee, you at that point in time -- and I don't want to

6    put words in your mouth, but I'm just trying to summarize --

7         THE DEFENDANT:  I understand.

8         THE COURT:  -- what I understand you to be saying.

9    After those conversations with Shaughnessy, you saw yourself as

10   wearing a little bit of both hats at that point in time.  You

11   didn't really know where it would go, it might go nowhere, it

12   might go state only or it might go federal.

13        THE DEFENDANT:  Right, that was --

14        THE COURT:  You were keeping your options open.

15        THE DEFENDANT:  I was definitely looking towards

16   direction, yes, Your Honor, the federal direction.

17        THE COURT:  Okay.  All right.  And some of the

18   information that you disclosed to Katherine Kealoha after you

19   had those discussions with Brian Shaughnessy was confidential

20   information obtained through NCIC queries.

21        THE DEFENDANT:  That is correct, Your Honor.

22        THE COURT:  You may not know who did the query, who

23   printed it, but you received it.

24        THE DEFENDANT:  I came into possession of it, yes, and

25   I disclosed it.

1          THE COURT:  And you knew it was confidential

2   information.

3          THE DEFENDANT:  Yes, I do, Your Honor.

4          THE COURT:  And you understood you weren't allowed to

5   disclose it.

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Okay.  Now, what was Ms. Kealoha's job at

8   that time?

9          THE DEFENDANT:  She was a Deputy Prosecuting Attorney.

10          THE COURT:  Did you disclose this to her in her role

11   as a Deputy Prosecuting Attorney or in her role as somebody

12   that you knew as Katherine Kealoha, sort of private citizen?

13          THE DEFENDANT:  In her private capacity, sir.

14          THE COURT:  Okay.  Because you could have disclosed

15   that to her in the normal course of your interaction with a

16   Deputy Prosecutor, that would not be an inappropriate

17   disclosure, correct?

18          THE DEFENDANT:  That is correct.  I knew that she was

19   an alleged victim of a crime.

20          THE COURT:  Okay.  And that she was not as a

21   prosecutor working on that case or she would be conflicted, you

22   would understand that?

23          THE DEFENDANT:  That is correct, that she wasn't

24   entitled to that -- such disclosure.

25          THE COURT:  So you knew you disclosed to her

1    confidential information.

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  You knew you weren't permitted to do so.

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  Under policy and regulation.

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  At that point in time when you made that

8    disclosure, you had spoken to Brian Shaughnessy.

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  And you came into possession of some of

11   that information after you spoke to Brian Shaughnessy.

12             THE DEFENDANT:  That is correct, Your Honor.

13             THE COURT:  And you saw this as a possible federal

14   prosecution.

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  So at the time the information, the -- not

17   the initial NCIC query, right, the printouts that came into

18   your possession, at the time those came into your possession,

19   they came into your possession at least in part based on your

20   employment as a designated federal agent.

21             THE DEFENDANT:  That is correct, Your Honor.

22             THE COURT:  All right.  And you felt that -- even

23   though you were DEA/marshals, you felt that crossed over

24   sufficiently that you would work with the Postal Service?

25             THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  With that designation.

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  All right.  Well, that's a lot, but I

4    think that satisfies me.  But, Mr. Wheat, let me turn to you

5    and see if there's anything else.

6          MR. WHEAT:  Your Honor, I think we've covered it.

7          THE COURT:  I hope so.

8          Mr. Sing?

9          MR. SING:  I have nothing, Your Honor, but I agree.

10         THE COURT:  All right.  Mr. Wheat, a little bit of a

11   caution.  I think this could have been drafted much better.

12   And, you know, if the thought was I wasn't going to take a look

13   at it somehow.

14         MR. WHEAT:  Wasn't that thought, Your Honor.

15         THE COURT:  Fair warning.

16         MR. WHEAT:  Understood.

17         THE COURT:  Before we go into trial.  Okay?

18         All right.  And, you know, that's why I gave you folks

19   fair warning this morning when I had my law clerk reach out

20   because as written, I don't think the elements the offense are

21   made out.  It took us a long time to get there, but I think --

22   and I think it's a very close call here, because clearly he's

23   not a federal employee in a traditional sense, there's no doubt

24   about that, right?  But I think what we need is that nexus,

25   some sort of nexus, which was absent from the papers that I saw

1  between what he was actually doing, what came into his

2  possession and that federal position that he did hold.  And

3  obviously you can't just say that somebody who is a designated

4  agent, federal agent, every time they do something, by getting

5  confidential information it's a -- and giving it out on the

6  state side is a federal violation.  That's just too broad and

7  would be something I could not accept.

8       But here we have at least some nexus between a federal

9  investigation, his status as a federal task force agent or

10  cross-designated agent, the information he obtained and the

11  information that was --

12       MR. WHEAT:  Understood.

13       THE COURT:  Okay.  So, Mr. Sellers, as to the

14  single-count information against you, how do you plead, guilty

15  or not guilty?

16       THE DEFENDANT:  Guilty, Your Honor.

17       THE COURT:  All right.  It is the finding of the Court

18  that the defendant is competent to understand the proceeding

19  and to enter a knowing and informed plea.  He understands the

20  charge, the plea is knowing and voluntary and not based on any

21  force or threat, and is not based on any promise other than

22  what is in the plea agreement itself.  The plea is supported by

23  an independent basis in fact containing each essential element,

24  he understands his rights associated with a trial, the

25  sentencing guidelines, and the other factors that I must

1    consider when I impose sentence, along with the maximum

2    possible punishment.  I accept your guilty plea and adjudge you

3    guilty.  I will file the plea agreement and reserve a

4    determination on accepting that until after a presentence

5    report has been prepared.

6          All right.  So I understand you folks have a request

7    of sentencing, which may or may not be granted, but let me hear

8    it.

9          MR. SING:  Your Honor, the defense request is as soon

10   as the Court can accommodate us.

11         THE COURT:  Well, what does that mean?

12         MR. SING:  After a PSR.

13         THE COURT:  Well, that's normal course though.  I mean

14   we can accommodate you in the normal course because this is

15   reversed engineered, these dates.  We work backwards from how

16   long it takes, you know, for the parties to get in their

17   objections, you know, review, get objections, and the

18   information to be gathered and the PSR to be written, it's all

19   reverse engineered, if you will.  So there's no wiggle room to

20   do it earlier unless we forego something.

21         MR. WHEAT:  Your Honor, I think what Mr. Sing meant

22   was that after the PSR is prepared, absent objections from the

23   party, we wouldn't have any objection to moving it to an

24   earlier date.

25         THE COURT:  Well, I'm going to set it in the regular

1  course and then we can see where that takes us.  Okay?

2          MR. WHEAT:  Okay.

3          THE COURT:  So if we can get a sentencing date.

4          THE COURTROOM MANAGER:  Your Honor, April 29, 2019, at

5  3 p.m.

6          THE COURT:  All right.  Anything else?

7          MR. SING:  Nothing.

8          THE COURT:  I assume there's no objection to the same

9  conditions of release staying in place.

10          MR. WHEAT:  No, Your Honor, he's been on supervision

11  for over a year and without incident.  We don't object.

12          THE COURT:  All right.  So I'm going to leave you out

13  under the same conditions of release as previously been set.

14  Okay.  So all those conditions remain, all the requirements

15  remain the same, okay, but continue to comply.  Okay?

16          THE DEFENDANT:  Yes, Your Honor.

17          MR. WHEAT:  -- the plea agreement for filing?

18          THE COURT:  When I leave you can do as you wish.

19          MR. WHEAT:  Okay.

20          THE COURT:  Thank you.

21          MR. WHEAT:  Thank you.

22          (The proceedings concluded at 4:05 p.m.,

23  January 11, 2019.)

24

25

1          COURT REPORTER'S CERTIFICATE

2

3          I, CYNTHIA FAZIO, Official Court Reporter, United

4     States District Court, District of Hawaii, do hereby certify

5     that pursuant to 28 U.S.C. §753 the foregoing pages is a

6     complete, true, and correct transcript of the stenographically

7     reported proceedings held in the above-entitled matter and that

8     the transcript page format is in conformance with the

9     regulations of the Judicial Conference of the United States.

10

           DATED at Honolulu, Hawaii, January 17, 2019.

11

12

13               */s/ Cynthia Fazio*
                 CYNTHIA FAZIO, RMR, CRR, CRC

14

15

16

17

18

19

20

21

22

23

24

25