1

1               IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF HAWAII

3
      UNITED STATES OF AMERICA,        )  CRIMINAL NO. 19-00003JMS
4                                      )
                    Plaintiff,         )  Honolulu, Hawaii
5             vs.                      )  April 29, 2019
                                       )
6                                      )
      DANIEL SELLERS,                  )  SENTENCING AS TO COUNT 1 OF
7                                      )   THE MISDEMEANOR INFORMATION
                    Defendant.         )
8     _____ )

9
                        TRANSCRIPT OF PROCEEDINGS
10           BEFORE THE HONORABLE J. MICHAEL SEABRIGHT
                  CHIEF UNITED STATES DISTRICT JUDGE
11
      APPEARANCES:
12
         For the Government:        MICHAEL G. WHEAT, ESQ.
13                                  Special Attorney of the United States
                                    Office of the U.S. Attorney
14                                  880 Front Street, Room 6293
                                    San Diego, California   92101
15

16
         For the Defendant:         RICHARD H.S. SING, ESQ.
17                                  The Law Office of Richard H.S. Sing
                                    841 Bishop Street, Suite 410
18                                  Honolulu, Hawaii   96813

19

20    Official Court               Cynthia Fazio, RMR, CRR, CRC
      Reporter:                    United States District Court
21                                 300 Ala Moana Blvd., C-270
                                   Honolulu, Hawaii  96850
22

23

24
      Proceedings recorded by machine shorthand, transcript produced
25    with computer-aided transcription (CAT).

```
 1   MONDAY, APRIL 29, 2019                           1:30 P.M.
 2           THE COURTROOM MANAGER:  Criminal Number 19-00003-JMS,
 3   United States of America versus Daniel Sellers.
 4           This case has been called for hearing on a sealed
 5   motion and a sentencing as to Count 1 of the misdemeanor
 6   information.
 7           Counsel, please make your appearance for the record.
 8           MR. WHEAT:  Michael Wheat for the United States, Your
 9   Honor.  Good afternoon.
10           THE COURT:  Yes, good afternoon.
11           MR. SING:  Good afternoon.  Richard Sing on behalf of
12   Daniel Sellers, who is present.
13           THE COURT:  Yes, good afternoon to both of you.
14           All right.  So let me start with you, Mr. Sing and
15   Mr. Sellers, and ask you both if you've had -- you may be
16   seated, Mr. Wheat -- if you've both had a full and fair
17   opportunity to read, review and discuss the presentence report.
18           MR. SING:  Yes, sir.
19           THE COURT:  And to file any objections, whether
20   factual or legal in writing.
21           MR. SING:  Yes, sir.
22           THE COURT:  Is that right, sir?
23           THE DEFENDANT:  That's correct, Your Honor.
24           THE COURT:  All right.  You may be seated.  Thank you.
25           All right.  So the defendant pled guilty here to a
```

1    single-count information.  After sentencing the government will

2    move to dismiss the counts in the indictment as to Mr. Sellers.

3         I do want the record to reflect there have been

4    numerous letters in support submitted, which I have read,

5    including one from the defendant.

6         And I understand then there are no objections from

7    either side as to either the factual findings in the report or

8    conclusions as to guidelines.

9         MR. WHEAT:  Correct, Your Honor.

10        MR. SING:  Correct, Your Honor.

11        THE COURT:  All right.  So with that the Court does

12   adopt the factual findings in the report as its own as well as

13   the conclusions as to the guidelines.

14        We have a total offense level six, criminal history

15   category one.  The guideline range of course is zero to six

16   months in Zone A.  Probation could be one to five years.  Fine

17   range of 500 to $5,000 and a $25 special assessment.  Do both

18   counsel concur with that?

19        MR. WHEAT:  Yes, Your Honor.

20        MR. SING:  Yes, Your Honor.

21        THE COURT:  And the 25, because this was a

22   misdemeanor.  Right.

23        Okay.  And I do want to say I have read, of course,

24   the Motion for Downward Departure as well as your sentencing

25   statement, Mr. Sing.

1           Do you want to add anything to the motion, Mr. Wheat,

2    at this point in time?

3           MR. WHEAT:  No, Your Honor.  I think it's factually

4    complete and accurate.

5           THE COURT:  All right.  I will grant the Motion for

6    Downward Departure.

7           MR. SING:  Thank you.

8           THE COURT:  All right.  With that then I'll hear from

9    you, Mr. Sing, first.

10          MR. SING:  Thank you, Your Honor.  Your Honor,

11   Mr. Sellers stands before you contrite and humbled over this.

12   He has spent his career as a law enforcement officer and as a

13   pretty good one and he stands before you here today to be

14   responsible for his conduct that transgressed those laws.  And

15   for that he is very contrite and he is sorry.

16          What I'd like to explain is sort of how something like

17   this could have occurred.  Mr. Sellers was part of the CIU

18   team.  And in 2013 when this offense occurred it was before

19   there was all of this intense media scrutiny and so much more

20   information had come to light.  And there was many years of

21   strong, trusting friendship, of professional trust, as well as

22   personal trust.  And when that mailbox was stolen, the CIU team

23   became involved.

24          And during the course of that investigation,

25   Mr. Sellers came into possession of basically a few simple

1    pieces of information that in his belief the video, which

2    showed a white car, was not owned by Gerard Puana.  Computer

3    databases showed that it was not owned by him, that he didn't

4    own a car of that likeness.

5              THE COURT:  A car of that what?

6              MR. SING:  Of that likeness.  Basically a white car

7    that looked a certain way.

8              THE COURT:  But you couldn't see the license plate on

9    the car?

10             MR. SING:  No.

11             THE COURT:  I see.  Okay.

12             MR. SING:  And so through a computer database he

13   learned what cars Gerard Puana did and did not have, as well as

14   a neighbor car, another potentially white vehicle.  And what he

15   basically passed on was that neither of those vehicles seemed

16   to be the car in the video.

17             And at that time I think it's important to remember

18   we've had many years of trusting friendship that seemed to be

19   warranted.  That, like I said, not just professional but

20   personal as well, dating back to childhood.  And there had been

21   the sharing of confidential information, appropriate sharing in

22   the past for years as well with no breaches of trust, with no

23   misuse of that information.  And so when a crime supposedly

24   happened at Ms. Kealoha's home, he updated her on -- on the

25   context of the investigation, and that's happened.

1           And let me say, and Mr. Sellers is going to tell you

2    in no uncertain terms, that we recognize why confidentiality

3    and security is so important.  As a police officer, especially

4    someone who spent much of his career in plainclothes, secrecy

5    is important.  Secrecy is something that lives and safety can

6    depend on.  And the breach of that can endanger that.  You

7    know, that wasn't the situation here, but we recognize why

8    these laws are important.  Mr. Sellers believes they're

9    important and would never have done what he did in this case

10   had he ever have thought that the information would be misused.

11          You know, the individual he shared it with was career

12   law enforcement, was someone who outranked him by orders of

13   magnitude in the chain of sort of hierarchies.

14          The Honolulu Prosecutor's Office has access to the

15   identical, you know, database entries.  Information could have

16   been gotten other ways.  So I think when he made this

17   disclosure it was with the idea that there was no harm that was

18   going to be done, there was no misuse that was reasonably

19   possible.  That it was within the circle of trust of people who

20   have in the past been trusted.

21          In this case, because she was the victim of a crime or

22   the supposed victim of a crime, she fell outside that circle on

23   this occasion.  And of course that's where the breach lies.

24          It's something that shouldn't have happened.  It's

25   something that will never happen again.  We respectfully ask

1    the Court to look at the guideline sentencing here and then

2    consider the downward departure.  We're already in a zero to

3    six situation.  Probation is recommending no period of

4    incarceration.  I don't believe the government's going to

5    recommend any period of incarceration.

6           So that leaves us with some other tools in our toolbox

7    to address this and to ensure that this is recognized as

8    serious as it is.

9           So the Court can impose a fine and the guideline range

10   tops out at 5,000 and there's some recommendations for that.

11   I'd ask to consider if that's really appropriate given the

12   nature of the downward departure motion.  I would recommend a

13   thousand dollar fine.

14          On the same note, with community service, I think

15   we're all basically going to recommend the same ballpark to

16   you.  And, you know, we would really defer.  Community service

17   is an important tool, both for the community and for the

18   offender, and something like a hundred hours I think would be

19   warranted.

20          I would ask the Court to carefully consider whether or

21   not any period of supervision is really needed.  I think when

22   we go back and we look at why people are put on probation, you

23   know, to help themselves remain lawful, to ensure community

24   safety, I think given Danny Sellers' unique position as a

25   longstanding trusted, pretty good police officer, is that kind

1   of thing really needed for our community or for him, and I

2   would respectfully submit that it's not.  In this case we could

3   recognize the seriousness of what happened through a fine and

4   community service and send Mr. Sellers on his way.

5           THE COURT:  So that's because he wants his job back?

6           MR. SING:  Excuse me, sir?

7           THE COURT:  It's because he wants his job back you're

8   requesting no supervision, correct?

9           MR. SING:  That's part of it, yes.  That's a big part

10  of it.  That's an important thing, you know.  Mr. Sellers has

11  been a good cop for a long time and it's been his dream job and

12  the department has benefited from Mr. Sellers over the years.

13  He's a highly trained professional police officer that has a

14  proven track record both in state and assisting the federal

15  government as well.  And it's my sincere hope that he can

16  continue with that and I know it's his.

17          So those are our requests, Your Honor.  Thank you.

18          THE COURT:  All right.  Thank you.

19          All right.  So, Mr. Sellers, this is your opportunity

20  to address me if you wish.  You don't have to and if you don't

21  I won't hold it against you.  If you do wish to, just pull that

22  mic up a little bit, all right, and speak into the direction of

23  that so I can hear you.

24          THE DEFENDANT:  Can you hear me, Your Honor?

25          THE COURT:  Good afternoon.  Yes.

```
1            THE DEFENDANT:  I would like to take this opportunity
2    to issue an apology, first of all, to you, Your Honor, to the
3    Department of Justice, to the FBI, to the community and that
4    I've served, to the men and women of the Honolulu Police
5    Department, to my friends and family, but most of all to my
6    wife and my two boys who rely on me to be their hero and their
7    role model.  You know, I've let them down.  I've let all of
8    these people down.
9            I remember the last time that I was here and you asked
10   me one simple question and it was, you know, to tell you what I
11   did.  And when you did that, I looked down at a, you know, at a
12   piece of paper that I -- you know, a statement that I had
13   prepared and I began reading from it.  And you promptly
14   reminded me that you wanted me to look you into the eyes and to
15   tell you, you know, what I did.  Out of anything that occurred
16   that day, that's what stood out the most.  If I did offend you
17   in any way, Your Honor, I do apologize.
18           THE COURT:  You didn't offend me, Mr. Sellers.
19           THE DEFENDANT:  And I'm here, you know, I'm present
20   today and I'm going to do what was expected of me back in
21   January and that's obviously to tell the truth and I think most
22   of all speak from my heart.
23           I'm extremely regretful of my actions that -- that
24   occurred back in June of 2013.  You know, although, you know,
25   my thoughts and my intentions were good in trying to help out a
```

1    friend, my execution of it was disastrous.  I disregarded my
2    policy, the federal law and -- and especially those guidelines
3    and those preventative measures that are in place for
4    confidential rights, confidential information, but for the
5    actual people behind those identities.
6            You know, I took it as, you know, my responsibility
7    and my right, you know, to go out and provide this information
8    to Kathy, you know, Katherine Kealoha, who was my friend, who I
9    trusted and who I had a history of -- of doing good and, you
10   know, for our community as well as our department.  I thought
11   that this person shared the same morals and values that I did
12   really.  And I was wrong.  I was dead wrong about ever thinking
13   that it was a right of mine and to ever think that Kathy ever
14   shared those same morals and values that I did.
15           Your Honor, being a police officer is not a right,
16   it's a privilege.  And to serve has been a privilege.  I forgot
17   that.  I got lost along the way and for that, Your Honor, I'm
18   truly sorry and ask for your forgiveness.
19           But as much as today seems like a negative day for me,
20   I mean rightfully so, I'm standing in front of a federal judge
21   awaiting, you know, sentencing, somewhere I never thought I
22   ever would be in my entire life, but it is quite different.  I
23   see this day very differently than probably what's on its
24   exterior.  And I see this place, you know, also, you know, it's
25   one of punishment, but I also see the other side of that

1    courtroom, I always have.  You know, I see it as a new

2    beginning, a place of change, and for me a place of

3    reconciliation and to regain that balance that I have in my

4    life.

5         You know, although I -- I began this process already,

6    you know, sometime ago, I guess, you know, today is also my

7    official beginning for that.  It is also my official beginning

8    of getting back on that path that I set for myself a very long

9    time ago.  That path of trust, that path of moving forward in a

10   positive direction.  And, Your Honor, whatever direction that

11   may be going.

12        You know, I've learned so much.  You know, I've

13   obtained so much knowledge about this encompassing, you know,

14   investigation that I'm involved in or this mailbox

15   investigation.  I've learned about the truth.

16        But, you know, it does pale in comparison to what I've

17   learned about being a husband and being a father because life

18   didn't spare my boys one bit of the pain and embarrassment, and

19   the fighting and the tears that was going on in their life for

20   the past couple years.  And my wife and I, we could have

21   continued to close those doors on them, you know, figuratively

22   and literally, and just hope and pray, you know, what they felt

23   and saw and heard, you know, be forgotten.  But we didn't.

24   We -- we love our kids.  So we took them along with this

25   journey.

1    And, you know, during this process of this whole

2 entire investigation some of the most important lessons in life

3 were learned, not just for them but for me.  And one of them is

4 that you're going to make mistakes in life.  It's inevitable.

5 You know, some bigger than the others, as, you know, of all

6 people I know.  But it's what you do with those mistakes that

7 make the person that you are.  You can go and not take

8 responsibility and point fingers and -- or you could own up to

9 them, accept them, move forward and assure yourself that these

10 things never happen again.  And that's what we did.  And when

11 we did that, we did that with the faith that one day this

12 situation will bring us some hope and some light.  And with the

13 help of the government, the help of this good man next to me

14 and some good old fashion hard work it brought me back to

15 that -- that path, that path that I should always have been on,

16 the path I should have never stepped off.

17    So, Your Honor, you know, as much as your decision

18 here today, you know, it means the world to me in terms of

19 my -- my short term, you know, well-being as well as what my

20 attorney talked about and my long-term goals and aspirations,

21 but your decision is not my world.  My -- my world is my wife,

22 who is the strongest person that I know, and my two boys.  And

23 I walked in here through these doors today a humbled man

24 with -- with my family intact.  And regardless of your decision

25 here today, Your Honor, I'm going to walk out the same.  And

1   for what I've put them through and what we've been through as,

2   you know -- as a family, that's all I ever could ask for.

3        And if -- or I should say I don't got to go very far,

4   Your Honor, to ever stray off this path that I have been

5   fortunate to get put back on.  All I have to do is remember my

6   wife's smile or my kids' happiness because every time I do see

7   that, I always -- I'm always reminded of the adversity and the

8   difficulty, you know, we went through to put those smiles back

9   on their faces.  So how easily it can be all taken away again.

10  I'm never doing that again to them, Your Honor.  I can promise

11  you that.  So I just thank you for your time.

12        THE COURT:  All right.  Thank you, Mr. Sellers.

13        Mr. Wheat?

14        MR. WHEAT:  Your Honor, a hallmark of an oath taken by

15  almost every law enforcement officer and people in the system

16  is to not let the guilty escape or the innocent suffer.  And in

17  this case Mr. Sellers forgot about that and he made a decision

18  based upon a friendship and a relationship that he had and he

19  violated that trust.  He made a bad judgment.  He stands before

20  you, I don't think he's offered an excuse, but I think he's

21  tried to offer an explanation for his conduct.

22        The United States has tried to look at the whole

23  person in this case in all the actions and tried to evaluate

24  what Mr. Sellers knew and when he learned those things.  And I

25  think that through this process, I've had an opportunity in the

1   last couple of years to speak with Mr. Sellers on several

2   occasions.  I've had an opportunity to see his eyes opened and

3   there are many times I think where he was genuinely shocked and

4   appalled by the judgment that he had made based upon that

5   friendship.  And that's what brings him here today is to be

6   accountable for that -- that breach of trust in that judgment,

7   that poor judgment that he exercised.

8          He resolved this case.  Contrition is very important.

9   I think the man who stands before you is very --

10          THE COURT:  He said it was poor judgment, not corrupt

11   judgment.

12          MR. WHEAT:  Correct.

13          THE COURT:  And what is your view on that?

14          MR. WHEAT:  I don't -- as I look at the totality of

15   the evidence and Mr. Sellers certainly has knowledge of -- he

16   doesn't see all of the things that -- that are out there, but I

17   think that -- I don't think it was corrupt judgment.  I don't

18   think he did it from a corrupt way to benefit himself or

19   anything in that manner.  I don't think it was corrupt.  I

20   think it was bad judgment on his part.  And that's why he got

21   the disposition he did is because it was not corrupt, but it

22   was poor judgment.

23          And, you know, there are times in everyone's life when

24   the runner stumbles.  The question is can they get up and can

25   they walk, can they run again.  Mr. Sellers has a long history

1    of being an excellent runner and I think that this will be a

2    stumble on his part.  I think he will get up.  No matter what

3    the sentence is, I think that the strength that he has himself

4    and through his family that he will succeed and I think the

5    sentence we recommend is a fair and just sentence in this case.

6              THE COURT:  What did you recommend as far as years of

7    probation?

8              MR. WHEAT:  It was two years of probation with credit

9    for the time that he's been under supervision.

10             THE COURT:  Right.  Okay.  Which has been how long?

11             MR. WHEAT:  About 18 months.

12             THE COURT:  All right.  All right.  Well, first let me

13   start with sort of the process I follow so everyone here who is

14   non-lawyers in the courtroom understand.  There are a set of

15   factors that Congress has set forth that district judges

16   consider when imposing the sentence.  They are set forth in the

17   law at 18 U.S.C. Section 3553(a).  I'm not going to recite each

18   of them for the sake of doing so, but I'm going to discuss

19   primarily the offense conduct and Mr. Sellers' background and

20   history and how it relates to this case, how he got here today.

21             First of all, you know, there was a bit of a bump in

22   the road with the change of plea, I think, because I was very

23   concerned about the sort of federal nature of it, right?  I was

24   trying to unpackage all of that during the plea.  But, you

25   know, what came out was you were cross sworn as a federal agent

1    at the time that you engaged in this conduct and a member of
2    CIU.  What that means is at both federal level and City and
3    County level you were a trusted public servant.  You understand
4    all this, Mr. Sellers.  I'm not going to say anything that I
5    don't think you would -- you know, I'm not going to say
6    anything I think you would disagree with or would disagree
7    with.  And you know, that's, as you point out, a tremendous
8    privilege and honor.  But with it comes a lot of
9    responsibility.  And that responsibility is one you have to --
10   anyone with that sort of -- in that position of public trust
11   has to remember day in and day out and sort of breathe.
12           When I talk to young law students, oftentimes I'll
13   talk about ethics as a lawyer because lawyers can often be
14   challenged in their ethics, just the nature of the job and sort
15   of things that lawyers are asked to do, especially in civil
16   practice.  You know, if you're a lawyer a long time,
17   eventually, you know, you'll be in a position you could
18   compromise yourself.  And I tell young lawyers you have to have
19   sort of an ethics memory, sort of like muscle memory almost,
20   right?  That you always have to sort of naturally move to do
21   the right thing and not the wrong thing.  And it takes work for
22   some people, for some people it doesn't.
23           But as has been aptly described here today, you've
24   been a good runner for many years and you tripped.  And it
25   was -- you know, you went down, right?  It wasn't just a

1    stumble, but you sort of went down.  Now, you're saying you got

2    back up and that's great and I'm very happy that, you know, you

3    sort of worked through this in your own mind and your family

4    remains strong.

5           But the fact is you were entrusted with this

6    information and to use it the appropriate way, in the right

7    way.  And you didn't do it.  And the information you did obtain

8    you did so, at least in part, due to your federal status.  You

9    knew what you did was wrong.  I mean because you understood the

10   rules.  But you broke the rule in part because Katherine

11   Kealoha was an old friend and of course was an attorney in the

12   Prosecutor's Office.

13          But you also knew she was not acting in that capacity.

14   I think we went through that during the change of plea, as I

15   recall, because I was very careful to go through all of this.

16   You understood she was not acting in that capacity but was an

17   alleged victim of a crime.  So you should have treated her that

18   way, which is with respect but not disclosing the information

19   you couldn't disclose to her.  No different than any other

20   victim of a crime that you've dealt with I'm sure scores and

21   scores and scores of times throughout your career.

22          So, you know, you did abuse your position of trust as

23   a police officer, that's baked into this guideline range, by

24   disclosing this information to a friend.

25          Now, in my view, regardless of the cooperation, and

1    you have cooperated and it's all set forth here, I'm not going

2    to go into it as far as the nature of the cooperation, but it's

3    clearly substantial assistance where you provided truthful

4    information to the government.  Even with that, though, if I

5    believe this was done with a corrupt intent, that is if I had

6    evidence before me that you did this because you knew, for

7    instance, that Katherine Kealoha was planning to do something

8    illegal with that information, or take anybody, doesn't have to

9    be her, right?  If the intent was a corrupt one, and you're a

10   police officer, a period of incarceration is called for.

11   Right?  So that's the difference to me.  That's the line of

12   demarcation, if you will, that makes this case different.

13          I want to be clear.  What I have before me in the

14   presentence report isn't about the mailbox case and your

15   involvement as alleged in that indictment.  What I have before

16   me is what you pled to in the information, and the information

17   about that.  So I'm presuming your innocence as to those other

18   matters because I don't have any of that before me.  And you

19   tell me you acted using extremely poor judgment but not in a

20   corrupt manner.  "Corrupt" is my word.  And Mr. Wheat has

21   agreed with that and there's nothing in this record before me

22   to suggest otherwise.

23          So there's a big difference between somebody acting

24   out of a wrong-headed motive and somebody acting with a corrupt

25   motive.

1          Obviously you have no prior convictions.  I mean you

2     wouldn't be a police officer if you did have prior convictions.

3     You accepted responsibility.  You've cooperated.  There have

4     been numerous letters written to me about your character, which

5     certainly is suggestive that your conduct in this case is

6     aberrant and falls outside of that general character that you

7     demonstrated over the years.  And you have a long history of

8     success, as has been mentioned today, at HPD.  No one's -- no

9     one's questioned that.

10          The problem, as was said, I think by Mr. Wheat, you

11     know, everyone eventually stumbles, but this was a big one,

12     right?  That's the problem for you.  This isn't a letter in

13     your file at work, right, that you did something that you

14     shouldn't have done.  This was more than that.  And it was a

15     gross, gross abuse of trust because you were a police officer

16     and because there are policies and processes in place to ensure

17     the fairness and integrity of investigation.  And an action

18     like yours undermines that process and therefore undermines the

19     integrity of investigation.  I think you understand all of

20     that.  From what I hear from you, you get all of that.

21          As so Mr. Wheat said you offer not an excuse but an

22     explanation.  That is your friendship with Katherine Kealoha,

23     knowing her for many years and you exercised poor judgment, I

24     would say bad judgment, I would say very bad judgment.  But

25     again, there's nothing before me to suggest it was corrupt,

1   there was a corrupt intent behind it.

2          So when I look at the factors under 3553(a), and the

3   goals of sentencing, there's a parse -- what we call the

4   parsimony clause.  It requires me to impose a sentence that is

5   sufficient but not greater than necessary to comply with the

6   goals of sentencing, and that includes deterrence, that

7   includes incapacitation, protecting you from further crimes,

8   and retribution.

9          First of all, I don't think you'll commit other

10  crimes.  Secondly, given what I've said already, I don't think

11  there is -- although in public corruption cases typically

12  deterrence is an important factor.  Given the fact, as I said,

13  that I don't believe you exercised corrupt intent, I certainly

14  have no evidence of that, I don't believe a sentence of

15  incarceration is required for a deterrent effect.  And the same

16  for retribution.

17         So I do believe that no term of incarceration is

18  appropriate here.  I do believe a period of probation, however,

19  is.  But I also agree that, you know, there are levels of the

20  degree of supervision of somebody on federal supervision from

21  very high to a high risk individual to very low for someone

22  who's very low risk.  And you would obviously fall in that

23  category of low, but it doesn't mean you shouldn't be on

24  probation.  But -- and I think a period more than what the

25  government has recommended but probably a little bit less than

1    what Probation has recommended is appropriate.  So I'm not

2    going to do the time served, if you will, for period on

3    supervision.  I'm just going to say from now forward what that

4    period is, okay.  So there's no credit for time on supervision,

5    pretrial supervision as the government has suggested.

6                    So no incarceration.  One year of probation.

7                    Now, as to the fine, I do believe you can afford and

8    pay a substantial fine in this case.  I do understand you have

9    other obligations.  The range is 500, is that the bottom?  To

10   5,000.  And looking at all the factors here, I think a fine of

11   $2500 is appropriate.

12                   Restitution is not applicable.  There is a $25 special

13   assessment.

14                   Now, as far as the conditions of supervision of

15   probation, Mr. Sing, would you waive having the standard

16   conditions read?

17                   MR. SING:  Yes.

18                   THE COURT:  And the mandatory conditions read?

19                   MR. SING:  Yes, we've gone over them.

20                   THE COURT:  All right.  And, Mr. Wheat, I assume you

21   have no objection to waiving the drug testing condition?

22                   MR. WHEAT:  I have no objection.  There's no

23   indication of any drug abuse, Your Honor.

24                   THE COURT:  Correct.  All right.  So because you don't

25   have any history of substance abuse and this case obviously

1    doesn't involve anything involving drug abuse, I will waive the
2    otherwise mandatory drug testing condition.
3            You must cooperate in the collection of DNA.
4            You must pay the $25 special assessment.
5            You must notify the court of any material change in
6    your economic circumstances that may affect your ability to pay
7    the fine and/or special assessment.  And, you know, I'll just
8    have him arrange with you a first meeting.  I won't tell him
9    when exactly.  Can you do that, Ms. Ing-Dodson?
10           THE PROBATION OFFICER:  Yes, Your Honor.
11           THE COURT:  Therefore I won't do the 72 hours.  When
12   I'm done you can talk to him and just arrange the first meeting
13   you want to have.
14           THE PROBATION OFFICER:  Yes, Your Honor.
15           THE COURT:  All right.  So a fine of $2500 is due
16   immediately.  When can you make that payment?
17           THE DEFENDANT:  I can make that today, Your Honor.
18           THE COURT:  Well, I don't want to put you in a
19   position where you say that and then you can't do it.
20           MR. SING:  Maybe we can say a week, Your Honor.
21           THE COURT:  A week.  Yeah, okay.  So a fine of $2500
22   is due within a week.  The special assessment is $25.  I
23   suggest you just pay that as well, then you'll be done within
24   that week, then you'll be done with the financial requirements.
25           THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Okay?  And then those are just behind you.

2     Okay?

3          You must provide Probation access to any requested

4     financial information and authorize the release of financial

5     information.  And that may be shared with the U.S. Attorney's

6     Office.

7          You must complete 80 hours of community service, all

8     right, within the one-year period.  80 hours, that's

9     essentially two weeks of work, okay, within a year.

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  So 80 hours of community service.

12         The probation officer will supervise your

13    participation in whatever it is that's chosen for the community

14    service, including the agency, the location, the frequency, et

15    cetera.  And you must provide written verification of the

16    completed hours.  Okay.

17         I think we have approved community service?

18         THE PROBATION OFFICER:  Yes, Your Honor.

19         THE COURT:  All right.  So you can talk to your

20    probation officer about that.  Okay.

21         And last, you must submit your person, property,

22    house, residence, vehicles, papers or office to a search

23    conducted by Probation.  Failure to submit to a search may be

24    grounds for revocation.  And you must warn any occupant of your

25    premises regarding this condition.  Now, a probation officer

1    may conduct a search only when reasonable suspicion exists that

2    you have violated a condition of supervision and the area or

3    areas to be searched contain evidence of that violation.  Any

4    search must be conducted at a reasonable time and in a

5    reasonable manner.

6            All right.  Are there any legal objections to the

7    intended sentence?

8            MR. WHEAT:  On the part of the United States, no, Your

9    Honor.

10           MR. SING:  No, sir.

11           THE COURT:  All right.  So the Court does impose

12   sentence as stated.

13           Our policy is because the charges you're going to

14   dismiss are in a different case you have to do that in a

15   written format as opposed to orally.

16           MR. WHEAT:  I shall.

17           THE COURT:  Okay.  So if you can just file the

18   dismissal of the counts against Mr. Sellers in the first

19   superseding indictment.

20           MR. WHEAT:  I will, Your Honor.

21           THE COURT:  Okay.  Now, Mr. Sellers, you have entered

22   into a plea agreement in which you have waived most of your

23   rights to appeal.  But if you believe that appeal waiver

24   provision is not enforceable or if you believe you can appeal a

25   matter not waived in that plea agreement, then you must file a

1   Notice of Appeal within 14 days of entry of judgment.  Failure

2   to do so acts as a waiver itself, meaning you forever give up

3   your right to appeal.  If you wish to bring an appeal but

4   cannot afford counsel, one will be appointed for you free of

5   charge.  Do you understand those rights?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  All right.  Anything else then that I've

8   neglected to take up?

9          MR. WHEAT:  No, Your Honor.  May I have 14 days from

10   the entry of judgment to file the dismissal?

11          THE COURT:  Of the indictment you mean?

12          MR. WHEAT:  Yes.

13          THE COURT:  Okay.  Yes, I'll give you that.  I don't

14   think that's going to be a problem.

15          All right.  Mr. Sing, anything else?

16          MR. SING:  Nothing, sir.

17          THE COURT:  All right.  Good luck, Mr. Sellers.

18          THE DEFENDANT:  Thank you, Your Honor.

19          MR. WHEAT:  Thank you, Your Honor.

20          THE COURT:  All right.  Court's in recess.

21          (The proceedings concluded at 2:07 p.m.,

22   April 29, 2019.)

23

24

25

```
 1                COURT REPORTER'S CERTIFICATE

 2

 3        I, CYNTHIA FAZIO, Official Court Reporter, United

 4  States District Court, District of Hawaii, do hereby certify

 5  that pursuant to 28 U.S.C. §753 the foregoing pages is a

 6  complete, true, and correct transcript of the stenographically

 7  reported proceedings held in the above-entitled matter and that

 8  the transcript page format is in conformance with the

 9  regulations of the Judicial Conference of the United States.

10        DATED at Honolulu, Hawaii, July 10, 2019.

11

12

13                        /s/ Cynthia Fazio
                          CYNTHIA FAZIO, RMR, CRR, CRC
14

15

16

17

18

19

20

21

22

23

24

25
```